NEIL G. BAGGE's (dependents') CASE.

Suffolk.    September 15, 1975. — December 3, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Workmen's Compensation Act,* Injuries to which act applies, Amount of compensation, Specific compensation. *Evidence,* Opinion: expert.

With respect to an employee whose chest was crushed in 1970 when the raised bed of a dump truck collapsed and pinned him to the truck frame and who was conscious before his death within twenty-four minutes, the opinion of a medical expert in response to hypothetical questions that the "secondary mechanism" of death probably was cerebral anoxia for a critical period of time caused by severe hemorrhaging and the collapse of both lungs, and that as a result of the cerebral anoxia the employee, if he had survived, would have suffered extensive loss of cerebral and voluntary motor function and lack of sensory perception and ability to communicate was warranted by evidence that the expert had examined the post mortem X-ray report and had heard the testimony before the Industrial Accident Board [132-135]; the expert's testimony warranted an award of a lump sum to the employee's parents under G. L. c. 152, § 36A, as appearing in St. 1951, c. 494, for the compensation to which he would have been entitled under § 36, if he had survived, for total loss of vision and hearing and function in both arms and legs, loss of "all other bodily functions," and disfigurement [135-137].

CERTIFICATION to the Superior Court of a decision of the Industrial Accident Board under the Workmen's Compensation Act.

The case was heard by *Lynch*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Francis F. Foley* for the insurer.

*Norman P. Beane* for the claimants.

HENNESSEY, J.    In this case the Liberty Mutual Insurance Company (insurer) seeks reversal of a judgment[1] in the Superior Court awarding the claimant parents of Neil G. Bagge (deceased) the lump sum of $57,375.[2] The lump sum was awarded to the deceased's parents as the uncollected balance remaining from compensation to which the deceased had become entitled under § 36 of c. 152 of the General Laws.    G. L. c. 152, § 36A.[3] After the appeal was entered in the Appeals Court, we transferred the case here for direct review, on our own initiative.

The deceased was fatally injured on August 28, 1970, when the raised bed of a dump truck he had been working with collapsed, pinning him between the bed and the truck frame.    Within minutes of the accident, two coworkers extricated him from beneath the truck bed.    The

---

[1] We use the terminology of Mass. R. Civ. P. 54 (a), 365 Mass. 820 (1974), which became effective after the disposition of this matter by the trial judge.

[2] The insurer was also directed to pay the claimants' fee for the appearance and testimony of a physician, G. L. c. 152, § 9A; interest from October 16, 1970, G. L. c. 152, § 50; and the costs to the claimants of review by the reviewing board, G. L. c. 152, § 10, and the Superior Court, G. L. c. 152, § 11.

[3] General Laws c. 152, § 36, as appearing in St. 1949, c. 519, provides for weekly or bulk sum payments, "in addition to all other compensation," to be paid to an injured employee for a designated period and for certain specified injuries.    General Laws c. 152, § 36A, as appearing in St. 1951, c. 494, provides in pertinent part: "In the event that an injured employee who has become entitled to compensation under section thirty-six dies before fully collecting the said compensation, the balance remaining shall become due and payable in a lump sum to his dependents, or if none, to his . . . surviving parents . . . ."

deceased was conscious and spoke a few words to one of his fellow workers, who rendered mouth-to-mouth resuscitation while awaiting further aid. The deceased was then taken to the Goddard Memorial Hospital in Stoughton, Massachusetts, but was dead on arrival.

The parents of the decedent received death benefits from the insurer pursuant to G. L. c. 152, § 31, and made a further claim for compensation under §§ 36 and 36A. A hearing was held by a single member of the Industrial Accident Board (board), who found that the deceased, had he lived, would have been entitled to compensation for total loss of vision in both eyes (§ 36 [a]), total loss of hearing in both ears (§ 36 [f]), total loss of function in both arms and both legs (§ 36 [t] and [q]; [n] and [q]), loss of "all other bodily functions" (§ 36 [i]),[4] and disfigurement resulting from the cumulative loss of these functions and senses (§ 36 [h]).

The insurer filed a claim for review with a three member reviewing board, which affirmed and adopted the single member's findings and decision. The insurer's exceptions and motion to strike certain testimony given at the hearing before the single member were saved. On further hearing in the Superior Court these exceptions were overruled and the motion to strike was denied; the judgment sustained the reviewing board's order in its entirety.

In urging reversal of the judgment, the insurer cites insufficiencies in the evidence on which the claimants' expert medical witness relied in responding to a hypothetical question regarding the losses the deceased would have suffered had he survived. Specifically, the insurer claims that there was no evidence as to when death actually occurred, and no evidence that there was a deprivation of oxygen to the brain for more than four

---

[4] As to loss of "all other bodily functions," the single member specifically mentioned "damage to the brain and nervous sytem . . . loss of function of the back, and loss of function of speech."

minutes. Deprivation for at least that length of time was crucial to the medical opinion favorable to the claimants' contentions. These evidentiary deficiencies, the insurer argues, resulted in impermissible speculation on the part of the claimants' expert as to the losses of function which the deceased would have experienced.

The insurer also presses reversal by contending that this case is distinguishable from a line of cases, all of which at least partially sustained awards under §§ 36 and 36A, where the injured employee expired shortly after the accident. See *Papanastassiou's Case*, 362 Mass. 91 (1972); *Chin's Case*, 357 Mass. 772 (1970); *Taylor's Case*, 355 Mass. 797 (1969); *Bosenquet's Case*, 353 Mass. 364 (1967); *Lauble's Case*, 341 Mass. 520 (1960); *Henderson's Case*, 333 Mass. 491 (1956). But see *Muchado's Case*, 356 Mass. 720 (1969); *Morris's Case*, 354 Mass. 420 (1968). The insurer argues that all of these cases involved either direct injuries to the brain or to specific body members for which awards were made, and that in each case the injured employee lived long enough for a medical examination and evaluation. Here, it is advanced, the award was made following expert medical testimony concerning the operation of a "secondary mechanism," i.e., deprivation of the blood supply to the brain for a critical period of time (four minutes) resulting in irreversible brain damage before death. We affirm the award in all respects.[5]

1. At the hearing before the single member there was somewhat conflicting testimony by the experts concerning the mechanism of death. Dr. Pierce H. Leavitt, medical examiner for Plymouth County at the time of the deceased's accident, stated that his examination of the body

---

[5] Our action in this case should make plain that cases of this nature do not turn on such arbitrary matters as the time lapse between injury and death, *Henderson's Case, supra* at 495, or the fact that no autopsy was performed, *Papanastassiou's Case, supra* at 95, or that medical testimony indicates that the injured employee could not have survived with the injury sustained.

shortly after death revealed "multiple fractured ribs, probable tear of the great vessels around the heart, and hemothorax; that is blood in the chest." He also testified to the existence of certain marks or scars across the chest where the truck bed impacted against the deceased, and, based on a post mortem chest X-ray, to a bilateral pneumothoraces or injury to the lung body which allows air in the lung to escape into the chest cavity. Based on his observations, Dr. Leavitt did not believe that, had the deceased survived, there would be any loss of use or disturbance to his arms, legs or sensory functions. Dr. Elliot L. Sagall, called by the insurer, testified that, in his opinion, the cause of death was simply a crushing injury to the chest with accompanying hemorrhage from the great blood vessels. He expressed "considerable doubt" that the injury here caused significant deprivation of oxygen to the brain for a critical period of time because there was evidence of consciousness on the part of the deceased after the injury. Dr. Sagall believed that it would be speculating to express an opinion in this case regarding the effect of the injury on the brain.

Dr. John P. Rattigan, called by the claimants, opined that the mechanism of death probably was cerebral anoxia resulting from severe hemorrhage of the great blood vessels and the collapse of both lungs. In his view, had the deceased survived the primary trauma, he would have suffered extensive loss of cerebral and voluntary motor function and lack of sensory perception and ability to communicate; in short, the deceased would have been reduced to a vegetative state, with only the lower centers of the brain remaining operative.

Of necessity, our function in passing on the admissibility of expert opinion testimony involves answering two questions: (1) Was the expert warranted in his conclusion on the basis of direct evidence or inferences reasonably drawn therefrom or from the evidence as a whole? and (2) Was the trier of fact warranted in its conclusion on the basis of the expert testimony and permissible in-

ferences drawn therefrom? See *Cormier's Case,* 337 Mass. 714, 716 (1958), and cases cited.

In answering the first of these questions, it is not for us to say whether an expert's testimony was technically sound as long as the proffered opinion is consistent with common sense and free from conjecture. *Murphy's Case,* 328 Mass. 301, 304 (1952). *Ruschetti's Case,* 299 Mass. 426, 430-431 (1938). *Coddaire* v. *Sibley,* 270 Mass. 41, 47-48 (1930). In responding to a hypothetical question, an expert cannot properly rely on misstatements of material fact. *Buck's Case,* 342 Mass. 766, 770-771 (1961). If this is the case, an expert's opinion is entitled to no weight. *Cormier's Case, supra.* In answering the second question, *supra,* we are guided by the well established principle that we must accept the board's decision as final if it is supported by the evidence and not wrong as matter of law. *Haley's Case,* 356 Mass. 678, 680 (1970), and cases cited. *Brigham's Case,* 348 Mass. 140, 141 (1964), and cases cited.

In this instance we must answer both queries affirmatively. We recognize that the claimants' expert was not testifying from personal knowledge of the events of August 28, 1970, nor did he examine the body of the deceased. Neither of these facts, however, is relevant on the issue of the admissibility of his opinion, and the insurer properly does not rely on them. We are convinced that Dr. Rattigan's testimony was correctly received because he had examined the post mortem X-ray report taken shortly after the accident, had heard the testimony of Dr. Leavitt who examined the deceased approximately thirty-five minutes after his admission to the hospital, and had also heard the testimony of the deceased's fellow employee and the policeman who transported the deceased to the hospital concerning immediate post-trauma events. There was direct testimony that the crushing injury caused internal hemorrhaging and collapse of both lungs. There was further direct testimony that the entire episode, from the injury

until the deceased was pronounced dead, consumed between seventeen and twenty-four minutes.

From the evidence as a whole, Dr. Rattigan was warranted in concluding, as he did, that the injuries in this case interfered with the blood circulation and oxygenation system, impaired the blood supply to the deceased's brain for a critical length of time, and led to permanent and near total function and sense losses.

On other occasions we have stated that the board's function in cases such as this is to find "as a fact for present award the future state of health and bodily function of living claimants." *Lauble's Case,* 341 Mass. at 522. This fact-finding is accomplished despite conflicting medical testimony, and intervening occurrence of the employee's death provides "no basis for a different rule of evidence." *Id.* at 523. Accordingly, we hold that, although the board might have been justified, based on all the evidence, in denying or partially denying some of the claims presented here, we cannot say it was required to do so as matter of law. See *Machado's Case,* 356 Mass. 720 (1969).

2. Justice R. S. Wilkins, later Chief Justice, writing of G. L. c. 152, § 36A, once noted: "It is unfortunate that a statute of such vital importance has not been phrased in unmistakably clear language." *Henderson's Case,* 333 Mass. at 494. Almost twenty years later we find ourselves still faced with the dilemma of giving "a reasonable and intelligent purpose to § 36A." *Id.* at 495.[6]

An examination of the briefs and records of the cases involving awards pursuant to § 36A, where death fol-

---

[6] We are, however, no longer faced with a problem which once presented itself in this context: whether the right to compensation under § 36, since it was considered to be in the nature of personal relief for the injured employee, was cut off and "displaced" by death benefits awarded under § 31 when the injured employee died from his injuries. See *Cherbury's Case,* 251 Mass. 397, 398-399 (1925); *Burns's Case,* 218 Mass. 8, 13 (1914). The enactment of § 36A by St. 1949, c. 519, and the construction of that statute in the *Henderson* opinion eliminated that issue.

lowed shortly after the injury, bears out the insurer's contention that the case at bar is distinguishable in some particulars.   In those instances where certain limbs or sense organs were not themselves irreparably damaged, there was discernible, direct trauma to the brain, brain stem, spine or central nervous system.   See, e.g., *Papana-stassiou's Case*, 362 Mass. 91 (1972); *Bosenquet's Case*, 353 Mass. 364 (1967).   The result of this trauma was inexorable: spastic quadriplegia, with speech or vision seriously impaired or lost altogether.   These direct injuries and the medical end result fit, even if somewhat uncomfortably, within the purview of §§ 36 and 36A.

However, were we to hold, as the insurer urges, that the line must be drawn on § 36A awards in this case because here there was an indirect and secondary mechanism of death, we would be ignoring sound judicial precedent.   This court in *Henderson* construed the language of § 36A in such a way that the possibility of an incongruous result was revealed: large sums of money could be awarded under the section "for a group of miscellaneous injuries resulting in death."   This court pointed out that an amendment to the statute might be in order. *Henderson's Case, supra* at 495-496.   We observe that § 36A has not been altered in any way since it was rewritten, prior to the *Henderson* opinion, by St. 1951, c. 494.

The trend of the cases since the *Henderson* decision has been to affirm awards made under § 36A on the ground, inter alia, that there is no distinction between the board's function in determining future health where an injured employee happens to survive with his injuries and those seemingly rare instances, such as in this case, where he does not survive.   See *Lauble's Case, supra* at 522-523.[7]

Furthermore, to hold as the insurer urges would be reading words into the statute which, express or implied,

[7] On the three occasions on which this court has upheld denials of certain § 36A awards, the reasons set forth were uncertainty as to specific bodily function losses or, what is perhaps the same thing,

simply are not there. The Legislature has said nothing about the cause of death or the manner in which the specified injuries compensated for under § 36 are received. It has been argued that the Legislature did not contemplate the result we reach in this case, but we are not willing to speculate as to their intention since the language of the statute is silent. Nor are we willing, in construing the statute, to establish a line of demarcation between cases in which the mechanism of injury and death is direct and cases where that mechanism is indirect; such a demarcation would amount to judicial legislating.

3. We have concluded that the sound precedent of the *Henderson* case requires us to affirm the award in this case. However, the questions raised in the *Henderson* case are presented even more acutely in the instant case. We agree with the insurer's assertion that recovery in a given situation may depend on arbitrary and illogical factors as much as or more than on presumably more rational considerations (e.g., the needs of the surviving dependents). The same injury may result in a substantial recovery in one case and no recovery whatsoever in another. Compare, for example, the injuries received by the young employee in *Morris's Case, supra* (multiple traumatic injuries from fall down elevator shaft, including crushed chest and skull fracture), where recovery was denied, with the injuries received by the deceased in the instant case. These, however, are reasons for possible legislative revision,[8] rather than for our consideration.                              *Judgment affirmed.*

---

insufficiency of the medical evidence on which hypothetical expert testimony was based. *Chin's Case,* 357 Mass. 772 (1970). *Machado's Case,* 356 Mass. 720 (1969). *Morris's Case,* 354 Mass. 420 (1968).

[8] See, e.g., the legislative schemes set forth in 5 U.S.C. §§ 8107, 8109, 8133 (1970); Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 908 (1970), § 909 (Supp. II, 1972); N.H. Rev. Stat. Ann. cc. 281:22, 281:26 V (1966 repl. ed.), as amended, Laws of 1973, cc. 481:5, 481:10; N.J. Stat. Ann. tit. 34:15-12 e (1975); N.Y. Workmen's Comp. Law §§ 15 (4), 16, 33 (McKinney, 1965).