STANLEY E. WALKER'S CASE.

Suffolk. November 4, 2004. - December 28, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Workers' Compensation Act,* Compensation, Injuries to which act applies, Lump-sum settlement. Survivor. *Administrative Law,* Agency's interpretation of statute. *Statute,* Construction. *Words,* "Specific injuries."

An employee, who suffered permanent losses of bodily functions and disfigurement due to a work-related injury involving brain damage, but who survived his injury, was entitled to benefits under the "specific injuries" provision of the Workers' Compensation Act, G. L. c. 152, § 36, and his benefits were not limited by G. L. c. 152, § 36A, which provides, among other things, for specific compensation for an injury involving brain damage, where § 36A applied only in those cases in which the employee died before fully collecting his benefits under § 36. [160-170]

APPEAL from a decision of the Industrial Accident Reviewing Board.

The Supreme Judicial Court granted an application for direct appellate review.

*Paul M. Moretti* for the employee.

*Kathleen A. Moore-Kocot* for the employer.

MARSHALL, C.J. Is an employee who suffers permanent losses of bodily functions and disfigurement due to a work-related injury involving brain damage, but who survives his injury, entitled to benefits under the "specific injuries" provision of the Workers' Compensation Act (act), G. L. c. 152, § 36, or are his benefits limited by G. L. c. 152, § 36A, which provides among other things for specific compensation for "an injury involving brain damage?" The question arises in this case as a consequence of debilitating brain damage suffered by Stanley E. Walker due to a work-related injury. For the reasons discussed below, we conclude that Walker is entitled to benefits under § 36 because § 36A applies only in those cases where the employee has died before fully collecting his benefits under

§ 36. We reverse the decision of the reviewing board of the Department of Industrial Accidents (board), which reached a contrary conclusion.

*Background.* The facts found by an administrative judge of the Department of Industrial Accidents and summarized by the board are, in the words of the board, "straightforward, undisputed and tragic." On August 7, 1995, Walker received cardiopulmonary resuscitation for approximately forty-five minutes after suffering cardiac arrest with brain injury, having developed severe dehydration while at work. Walker now suffers from anoxic encephalopathy, a condition involving the death of brain tissue and resultant permanent losses of function. The judge found that Walker is in a "near-vegetative state" and is "unable to do anything without the assistance of another person." According to his physician, Walker "has, inter alia, lost cognitive function, has paranoid ideation, has difficulty eating, has no social graces, has difficulty sleeping, requires assistance walking, and he has a loss of depth perception." There is no chance Walker will recover his lost functions, and his injury likely will cause further functional deterioration. We now summarize the legal proceedings that have brought this case before us.

Walker sought compensation from the town of Barnstable (town), a self-insurer, for the total loss of the use of both arms, pursuant to G. L. c. 152, § 36 (1) (*e*), total loss of the use of both legs, pursuant to § 36 (1) (*g*), and bodily disfigurement, pursuant to § 36 (1) (*k*).[1] The town accepted Walker's injury as

[1] General Laws c. 152, § 36, provides, in pertinent part:

"(1) In addition to all other compensation to the employee shall be paid the sums hereafter designated for the following specific injuries; provided, however, that the employee has not died from any cause within thirty days of such injury: . . .(*e*) For the . . . permanent, total loss of use . . . of both arms, a sum equal to the average weekly wage in the commonwealth at the date of injury multiplied by ninety-six. . . .(*g*) For the . . . permanent, total loss of use . . . of both legs, a sum equal to the average weekly wage in the commonwealth on the date of injury multiplied by ninety-six. . . .(*k*) For bodily disfigurement, an amount which, according to the determination of the [administrative judge] or reviewing board, is a proper and equitable compensation, not to exceed fifteen thousand dollars; which sum shall be payable in addition to all other sums due under this section. . . ."

work related, but disputed his claim for such compensation. On August 3, 1998, an administrative judge held a conference pursuant to G. L. c. 152, § 10A. The next day, the judge issued an order denying the claim. Walker appealed.

On April 20, 1999, the judge held a hearing pursuant to G. L. c. 152, §§ 11 and 11B. On January 14, 2000, the judge concluded that G. L. c. 152, § 36A, rather than G. L. c. 152, § 36, applied to Walker because his losses were due to brain damage.[2] The judge, however, denied Walker benefits under § 36A, concluding that he had "failed to meet his burden of providing proof that he has reached maximum medical improvement for which he would be entitled to benefits under § 36A." Walker appealed from the decision to the board.

On July 30, 2002, the board affirmed the judge's decision to the effect that the brain damage provision of § 36A applied to Walker, but reversed the ruling that Walker had not reached maximum medical improvement. The board ordered benefits be paid to Walker to the maximum amount provided in § 36A. Walker appealed from the decision to a single justice of the Appeals Court and requested an award of full benefits for his specific injuries under § 36. See G. L. c. 152, § 12 (2); Rule 2:04 of the Rules of the Appeals Court (2004).

---

[2]General Laws c. 152, § 36A, provides:

"In the event that an injured employee who has become entitled to compensation under section thirty-six dies before fully collecting the said compensation, the balance remaining shall become due and payable in a lump sum to his dependents, or if none, to his surviving issue, or if no surviving issue, then to surviving parents, or if no surviving parents then to surviving brothers and sisters. If there are none of the persons described in the preceding sentence remaining to receive such compensation, then the balance of compensation remaining at the death of the employee shall be paid into the special fund in the custody of the state treasurer established under section sixty-five, to be used for the purposes and in the manner prescribed in said section sixty-five.

"Where any specified loss, losses or disfigurement under section thirty-six is a result of an injury involving brain damage, payment in total under that section for the sum of such loss, losses or disfigurement resulting from said brain damage shall not exceed an amount equal to the average weekly wage in the commonwealth at the date of injury multiplied by one hundred and five. In no event shall payments be made under this section to any employee where the death of such employee occurs within forty-five days of the injury."

On April 21, 2004, the single justice of the Appeals Court affirmed the board's decision. Walker appealed to a panel of the Appeals Court. We granted Walker's application for direct appellate review.[3]

*Discussion.* "The interpretation of a statute by the agency charged with primary responsibility for administering it is entitled to substantial deference." *Gateley's Case,* 415 Mass. 397, 399 (1993). We scrutinize the board's decision under G. L. c. 152, § 12 (2), in accordance with the standards expressed in G. L. c. 30A, § 14 (7) (*a*)-(*d*), (*f*), and (*g*), to determine whether "the board correctly decided that the administrative judge had properly applied [§ 36A]." *Scheffler's Case,* 419 Mass. 251, 258 & n.4 (1994).

The town argues that the plain language of § 36A compels the result it seeks. But, as the board itself explained, it did "not consider that the brain damage provision, given its placement in § 36A, is subject to a simple, plain meaning reading." Resolution of this case therefore turns on our construction of § 36A.[4] "The general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Hanlon* v. *Rollins,* 286 Mass. 444, 447 (1934).

In the context of claims for workers' compensation this court has said that the act is to be interpreted "so far as may be, to promote the accomplishment of its beneficent design." *Neff* v. *Commissioner of the Dep't of Indus. Accs.,* 421 Mass. 70, 73 (1995), quoting *Young* v. *Duncan,* 218 Mass. 346, 349 (1914). Enacted as a "humanitarian measure" in response to strong

---

[3]The board's conclusion concerning the maximum medical improvement reached by Walker is not at issue in this appeal.

[4]Noting the "persuasive arguments" of Walker, the board explicitly recognized that its conclusion "is subject to further review in the courts of the Commonwealth," and expressed "frustration" that the statutory language at issue "has not been phrased in unmistakably clear language," quoting *Henderson's Case,* 333 Mass. 491, 494 (1956).

public sentiment that the remedies afforded by actions of tort at common law did not provide adequate protection to workers, we give this remedial statute a "broad interpretation." *Neff* v. *Commissioner of the Dep't of Indus. Accs.*, *supra*. While the Legislature has from time to time made substantial revisions to the original workers' compensation legislation enacted in 1911, a "broad interpretation" of the act remains appropriate because the act's exclusivity provision eliminates the employee's common-law remedies against his employer. See *id.* at 75 ("purpose of the workers' compensation act was to ensure that employees, who give up their rights to sue employers in tort, will recover lost wages and lost earnings capacity and medical expenses resulting from work-related injuries, regardless of fault or forseeability"). See *Meley's Case*, 219 Mass. 136, 139 (1914). Against this general background we turn to examine the legislative history of G. L. c. 152, § 36A.

Two provisions of the act are at issue in this case. The first, G. L. c. 152, § 36, sets forth the amount of compensation for "specific injuries" to which an employee is entitled for work-related injuries. Specifically, compensation is paid to an employee who sustains permanent loss of sight, hearing, arms, legs, or other bodily functions, or who has a permanent disfigurement. See note 1, *supra*. This compensation is in addition to any amount the employee or his dependents are entitled to receive under other sections of the act.[5] The amount of the compensation depends on which bodily function or functions the employee has lost as a result of his injury, and is calculated as a specific multiple of the average weekly wage in Massachusetts for the date on which the employee was injured. See note 1, *supra*.

The second provision at issue here, G. L. c. 152, § 36A, identifies the class of beneficiaries eligible to receive a lump-

---

[5]See, e.g, G. L. c. 152, § 26 (compensation for personal injury); G. L. c. 152, § 30 (medical expenses); G. L. c. 152, § 31 (death benefits for dependants); G. L. c. 152, § 33 (burial expenses); G. L. c. 152, § 34 (compensation for permanent and total incapacity); G. L. c. 152, § 35 (compensation for partial incapacity).

sum payment should the employee die before fully collecting his § 36 compensation payments. Section 36A limits payment to his survivors[6] based on the type of injury and whether the employee lived for a sufficiently long period after being injured. We examine the intent, purpose, and history of these provisions to determine their proper application in this case. See *Hanlon* v. *Rollins, supra.*

From the beginning of the Massachusetts workers' compensation system in 1911, an employee was entitled to compensation for specific work-related injuries under earlier versions of what is now § 36. See St. 1911, c. 751, Part II, § 11. The compensation to which an employee was entitled but had not fully collected at his death did not, however, inure to survivors. See, e.g., *Cherbury's Case*, 251 Mass. 397, 398-399 (1925); *Burns's Case*, 218 Mass. 8, 13 (1914). That changed in 1947, when the Legislature added to § 36 a paragraph that, for the first time, provided for survival rights of compensation for specified injuries due but unpaid at the employee's death, and specified the beneficiaries entitled to such payments.[7] For reasons that are not clear from the legislative history, two years later the Legislature rewrote this paragraph, removed it from § 36 and placed it in a newly created § 36A with the marginal note of "[l]ump sum payment to dependants in case of death."[8] The

---

[6]If the deceased employee has no survivors as defined in G. L. c. 152, § 36A, the balance of compensation remaining at his death is paid into a special fund in the custody of the Commonwealth's Treasurer.

[7]The 1947 amendment added the following paragraph to § 36, with the marginal note "[p]ayments in case of death:" "In the event of the death of an employee entitled to payments hereunder, his widow or dependents shall be paid the sums which would otherwise have been paid to him; provided, that no person shall receive payments under this paragraph and also under the pertinent provisions of law authorizing payment on account of the injury resulting in such death." St. 1947, c. 634, § 3.

[8]The 1949 amendment enacting § 36A provided the following: "In the event that an injured employee who has become entitled to compensation under [§ 36] dies before fully collecting the said compensation, the balance remaining shall become due and payable in a lump sum to his dependents or if none to his father or mother, or if none to his brothers and sisters and to the issue of any deceased brother or sister by right of representation." St. 1949, c. 519.

only substantive changes to the section as amended in 1947 broadened the group of defined beneficiaries entitled to receive unpaid compensation at the time of the employee's death and provided for payment in a lump sum. At its inception, therefore § 36A applied only to cases involving deceased employees.

There were no legislative changes to G. L. c. 152, § 36A, until 1981. See St. 1981, c. 572, § 4.[9] Walker argues, and the board does not contend otherwise, that the 1981 changes to § 36A were in reaction to this court's decision in *Bagge's Case*, 369 Mass. 129 (1975), and the court's invitation in that case for legislative action to address disparities in compensation due to injured workers as a result of "arbitrary and illogical factors."[10] *Id.* at 137. That case concerned an employee who died within minutes of receiving work-related injuries that caused brain damage.[11] The court concluded that the employee's family was entitled to a lump-sum payment under § 36A for the employee's resulting losses of bodily function and disfigurement that qualified for § 36 benefits, noting that the "Legislature has said nothing about the cause of death or the manner in which the specified injuries compensated for under § 36 are received." *Id.*[12] With the 1981 change, the Legislature addressed

[9]The 1981 act also amended certain aspects of § 36, increasing the awards for specified injuries compensation. St. 1981, c. 572, § 3.

[10]In 1984, the leading authority on workers' compensation in Massachusetts characterized the 1981 amendment as "a response to claims made on the authority of Bagge's Case, that a heart attack or other injury had caused cerebral anoxia or other brain damage resulting in losses under all subsections of [§ 36]." This was noted in a treatise section entitled "Specific Compensation — Effect of Death of *Employee*" (emphasis added). L. Locke, Workmen's Compensation § 352 (2d ed. 1981 & Supp. 1984).

[11]The employee apparently suffered brain damage when the raised bed of a dump truck collapsed, "pinning him between the bed and the truck frame," causing severe internal bleeding and collapsed lungs with resulting deprivation of oxygenated blood to his brain. *Bagge's Case*, 369 Mass. 129, 130, 133, 135 (1975). Although conscious when his coworkers extricated him, he died within twenty-five minutes of the incident. *Id.* at 131, 134-135.

[12]The employee's parents received death benefits under G. L. c. 152, § 31. They also sought, and were awarded, compensation for specific injuries under §§ 36 and 36A for their son's total loss of vision in both eyes, hearing in both ears, function in both arms and both legs, all other bodily functions, and disfigurement resulting from the cumulative loss of these senses and functions. *Bagge's Case, supra* at 131, 137.

precisely these points by adding a new paragraph to § 36A, which limited compensation for specific injuries involving brain damage to a specified amount, twenty thousand dollars, but disallowed such compensation entirely in cases of "instantaneous death."[13]

We have reviewed carefully the legislative history leading to this amendment. It is apparent to us that the Legislature intended such limitations to apply only in cases where an employee's work-related brain injuries had in fact resulted in death.[14,15]

---

[13]The 1981 amendment added the following paragraph to § 36A: "Where any specified loss or losses under [§ 36] is a result of an injury involving brain damage, then, to that extent, payment in total under this section for such specific loss or losses resulting from said brain damage only shall be in the amount of twenty thousand dollars. In no event shall payments be made under this section for an injury resulting in instantaneous death." St. 1981, c. 572, § 4.

[14]The Legislature first considered a bill to address the result reached in *Bagge's Case, supra,* in 1979. See 1979 House Doc. No. 1316. Thereafter, different bills took different approaches. Some bills denied compensation to the employee's survivors unless the injured employee survived his work-related injury for a stated period. See, e.g., 1979 House Doc. No. 3852 (thirty days); 1979 Senate Doc. No. 135 (fifteen days); 1980 House Doc. No. 3326 ("In no event shall payments be made when there is instantaneous death"). Other bills provided a lump-sum payment of benefits to survivors if the employee dies from a cause unrelated to the original injury. See, e.g., 1979 House Doc. No. 2874; 1980 House Doc. No. 1026. Some applied both types of restrictions. See, e.g., 1979 House Doc. No. 1316 (thirty days), 1980 House Doc. Nos. 3334, 3343 (same). Most of these bills implemented restrictions by rewriting the first sentence of § 36A; none placed the restrictions in § 36. See, e.g., 1979 House Doc. Nos. 1316, 2874; 1980 Senate Doc. No. 171. Several of the bills included the phrase "certain death cases" in their titles. See 1979 House Doc. No. 1316; 1980 House Doc. Nos. 3334, 3343; 1981 House Doc. No. 467 (each entitled, "An Act relative to the payment of compensation for specified benefits in certain death cases").

The first bills specifically limiting benefits for deceased employees whose § 36 losses were due to brain damage were proposed in 1980. See 1980 House Doc. No. 3326; 1980 Senate Doc. No. 171. Each of these bills modified the first sentence of § 36A by adding a proviso, "except that where any specified loss under [§ 36] may be a result of an injury involving brain damage, then, to that extent, payments under this section shall be limited."

The Senate referred all of the 1980 bills cited above, together with others not relevant here, to the Committee on Commerce and Labor to sit during recess "for the purpose of making an investigation and study of the subject matter." See 1980 Senate Doc. No. 2102. This order was committed to the Committee on Ways and Means, which reported a bill following the recess. See 1980 Senate Doc. No. 2241. This was the first bill that limited payments

There is nothing in the legislative history that reveals a concern with a brain-damaged worker's progressive loss of function while assisted by "medical technology available that theoretically could keep someone alive for an indefinite amount of time simply by hooking them up to machines," as the town argues here. Indeed, the employee in *Bagge's Case, supra,* did not benefit from any advances in medical technology.

As of 1981, § 36A continued to serve two purposes: it identified those survivors entitled to receive uncollected compensation for specific injuries on an employee's death, and it specified the amount of such compensation based on the type of injury and the amount of time between the occurrence of the injury and the employee's death. There matters stood until 1985, when the Legislature once again turned its attention to the complex problem of how to compensate injured employees fairly, while controlling the related costs to employers. See St. 1985, c. 572.

Of the extensive legislative changes to the act enacted in 1985,[16] only one is relevant to our inquiry. As in 1981, the 1985 amendments to § 36 and § 36A contained an increase in the amount of compensation for specific injuries, this time adding a

in cases involving brain damage or instantaneous death by adding a second paragraph to § 36A rather than by modifying the first paragraph. It also rewrote § 36. Although the Legislature took no further action in 1980 on this bill, the Senate introduced a similar one the next year. See 1981 Senate Doc. No. 186. The Legislature enacted the bill with minor amendment. See note 13, *supra.*

[15]Many of the titles of these bills refer specifically to compensation in "death" cases. Most bills proposed placing the restriction in the first sentence of § 36A, a sentence that begins, "In the event that an injured employee who has become entitled to compensation under [§ 36] dies . . . ." The final sentence of § 36A, inserted by St. 1981, c. 572, § 4, expressly applies only in cases of "instantaneous death." If the Legislature had intended to restrict benefits to surviving employees, it could have added the restriction to § 36, which was contemporaneously amended in other respects.

[16]The House referred seventy-nine individual documents concerning the act to the Committee on Commerce and Labor, which reported back a single bill. See 1985 House J. 627. The bill was rewritten by the Committee on Ways and Means and was enacted with minor amendments. 1985 Senate Doc. No. 2596. St. 1985, c. 572.

mechanism for future increases.[17] Prior to 1985 both §§ 36 and 36A had contained fixed dollar amounts to calculate the amount of compensation for specific injuries. The 1985 amendments modified both sections such that compensation under both was now calculated on the basis of the average weekly wage in the Commonwealth on the date of the injury, effectively introducing an automatic cost-of-living adjustment to such compensation.[18] Once again, the Legislature left intact the distinction between compensation payable to an employee who survives his injuries, as described in § 36, and the compensation payable to the employee's survivors on his death, described in § 36A. In short, as amended in 1985, § 36A remained consistent with its original legislative purpose: to identify those survivors entitled to receive uncollected compensation for specific injuries on an employee's death, and to specify the amount of such compensation based on the type of injury and the amount of time between the occurrence of the injury and the employee's death.

Legislation in 1991, driven by the escalating cost of workers' compensation insurance premiums, once again sought to overhaul the workers' compensation act. The amendments included two changes relevant to our inquiry. First, death benefits for specific injuries were no longer available to survivors in cases where an employee did not survive his injury

---

[17]The only one of the bill's seventy sections that affected § 36A replaced the first sentence of the second paragraph with the following: "Where any specified loss, losses or disfigurement under [§ 36] is a result of an injury involving brain damage, payment in total under *that* section for the sum of such loss, losses or disfigurement resulting from said brain damage *shall not exceed an amount equal to the average weekly wage in the commonwealth at the date of injury multiplied by one hundred and five*" (emphasis added). St. 1985, c. 572, § 47. The twenty thousand dollar limit contained in the 1981 version of § 36A was thereby replaced by an escalating maximum based on the average weekly wage at the time of injury multiplied by 105 weeks.

[18]The 1985 legislation made another, seemingly minor, change to § 36A: it replaced the phrase "payment in total under *this* section," i.e., § 36A, with "payment in total under *that* section," i.e., § 36 (emphases added). We think this change intended to clarify that any § 36 payments made to the employee while alive would count toward the new 105 week limit under § 36A. Previously, § 36A could have been interpreted to provide that payments made to the employee before his death did not count toward the $20,000 limit under § 36A. This change apparently originated in the Committee on Commerce and Labor during its study of the many proposed amendments, none of which included any changes to § 36A.

for at least forty-five days.[19] See St. 1991, c. 398, § 70.[20] (Previously such compensation was not available to survivors only in cases of "instantaneous death.") Second, the 1991 amendments added to § 36 a provision requiring for the first time that an employee survive his injury for thirty days before qualifying for specific injuries compensation under that section. St. 1991, c. 398, § 68.

The board said it recognized "the strength" and "persuasive-[ness]" of Walker's argument that § 36A's brain damage provision cap applies only in cases where the employee has died, and "might even have agreed with" it. But, in reflecting on the 1991 changes to § 36 and § 36A, the board concluded that, because the noncompensatory periods contained in § 36 and § 36A were different (thirty days under § 36 and forty-five days under § 36A), the two were in "conflict." That "conflict" it said, could only be resolved if "the cap on § 36 benefits in the § 36A brain damage provision applies to *both* living and deceased employees" (emphasis added). We disagree.

Different noncompensatory periods in § 36 and § 36A do not compel the conclusion that the § 36A brain damage provision must necessarily apply to living employees as well as those employees who are deceased. The 1991 amendments to § 36 provide that an employee must survive for a certain period, thirty days, before *an employee* is entitled to compensation for specific injuries, whether his injuries are due to brain damage or any other cause. The forty-five day noncompensation period in § 36A is directed to survivor beneficiaries of an employee who suffers from brain damage.[21,22] Under that section, an employee must survive an injury involving brain damage for forty-five

---

[19]The 1991 amendment revised the final sentence of § 36A to provide: "In no event shall payments be made under this section to any employee where the death of such employee occurs within forty-five days of the injury." St. 1991, c. 398, § 70.

[20]The Lieutenant Governor explained that the rising cost of workers' compensation insurance was "the major impediment to economic growth in the state." State House News Service Press Release, Dec. 23, 1991. Prior to the legislation's enactment in 1991, the insurance industry had sought a 46.5 per cent increase in workers' compensation insurance premiums. *Id.*

[21]Because the question is not before us, we do not consider whether the forty-five day noncompensatory period applies when an employee who did *not* suffer brain damage dies.

days before a *survivor* is entitled to uncollected compensation for specific injuries. Thus, an employee who suffers brain-related injuries may collect whatever compensation is available to him under § 36, provided he survives his injury for thirty days. If he dies between the thirtieth day and forty-fifth day of his injury, his survivors are entitled to no compensation whatsoever, i.e., if he dies within forty-five days of his injury there are no remaining uncollected ":balances" from § 36 due to his survivors under § 36A. Only if he dies after the forty-fifth day of his injury, will his survivors be entitled to any uncollected amounts of compensation for any injuries to which the employee had become entitled under § 36. Thus § 36A remains a death provision that serves its two original purposes: to identify those survivors entitled to receive uncollected compensation for specific injuries on an employee's death, and to specify the amount of such compensation based on the type of injury and the amount of time between the date of injury and the employee's death.

Whether one adopts the interpretation of the board, or the interpretation of Walker, the language of § 36A cannot be internally reconciled, or reconciled fully with § 36.[23] In these circumstances the purpose of the two sections as evidenced by the legislative history becomes determinative. Close analysis of the legislative history of the noncompensatory periods added in 1991 to both §§ 36 and 36A leads us to our conclusion that § 36A applies only in cases where the employee dies. Although the over-all thrust of the 1991 legislation was to reduce the cost of workers' compensation insurance to employers, the discrepancy between the length of the noncompensatory periods under § 36 and § 36A arose from successive amendments to the proposed legislation that in fact favored employees. More importantly, and as we shall explain, the way in which the

---

[22]This amendment to § 36A foreclosed litigation over whether the employee's death was "instantaneous," which had apparently occurred in the wake of St. 1981, c. 572, § 4. See, e.g., *Zavella's Case*, 6 Mass. Workers' Comp. Rep. 276 (1992).

[23]For example the last sentence in § 36A, inserted in 1991 and containing the forty-five day period is inconsistent with the remaining provisions of § 36A because it refers to payments "made under this section to any employee." Section 36A does not provide for payments to "any employee."

discrepancies arose makes it unlikely that the Legislature intended to enact a dramatic change to § 36A to the effect that it apply for the first time since its enactment in 1947 to employees who *survived* brain injuries.

Throughout the 1991 legislative process, the noncompensatory periods proposed for both § 36 and § 36A were of the same duration. See, e.g., 1991 Senate Doc. Nos. 1741, 1745; 1991 House Doc. No. 6357. On December 11, 1991, during one of the last substantive debates on the proposed legislation, a member of the House of Representatives proposed an amendment to *benefit* employees by reducing the noncompensatory periods in both § 36 and § 36A from ninety to forty-five days. See 1991 House J. 1438. The House approved the amendment without discussion or debate. *Id.* Later in the same session, another Representative proposed a further amendment, again to *benefit* employees, this time shortening the noncompensatory period under § 36 to thirty days. See 1991 House J. 1440. The House approved this amendment, which gave rise to the discrepancy between § 36 and § 36A, without discussion or debate. *Id.* There is no suggestion that this minor amendment to § 36 was intended to effectuate a dramatic change in § 36A to the substantial detriment of a certain class of employees, namely those employees who survive but are severely disabled by brain injuries.

On December 20, 1991, without further discussion or debate on § 36 or § 36A, the House enacted the bill containing the two different noncompensatory periods. See 1991 House Doc. No. 6410; 1991 House J. 2423. The board's conclusion that the 1991 amendment to § 36 necessarily requires that § 36A be interpreted to apply to living employees who suffer work-related injuries involving brain injury is counter to the intent, purpose, and history of § 36A. It also produces arbitrary and inequitable results. Under the board's reasoning, § 36 compensation for specific injuries is payable to any employee with permanent losses of bodily function such as those suffered by Walker, but if, and only if for example, those losses were caused by a spinal cord injury, rather than a brain injury. Benefits to an employee with precisely the same losses of bodily function caused by brain damage would be limited. Our analysis of the legislative

history of §§ 36 and 36A reveals no suggestion that the Legislature intended to differentiate in such an arbitrary manner between classes of disabled, but living, employees.

In summary, the limitation on unpaid compensation for specific injuries involving brain injury contained in the second paragraph of § 36A is operative only on the death of the employee. Walker is entitled to receive compensation for specific injuries for his losses of bodily function and disfigurement under § 36. As Walker is the prevailing party, he is also entitled to an award of reasonable attorney's fees and costs resulting from his appeal. See G. L. c. 152, § 12A.

We reverse the decision of the board and remand the case for further proceedings consistent with this opinion.

*So ordered.*